UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 2:22-CR-83 JD |
| VANESSA POSEY | |

**OPINION AND ORDER**

The Defendant, Vanessa Posey, has moved for count three of the indictment against her to be dismissed (DE 17). Defendant argues this count should be dismissed as the statute underlying the charge, 18 U.S.C. § 922(g)(3), is unconstitutional in light of the Supreme Court's recent decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022). Further, Defendant argues this statute is unconstitutional as applied to her in light of a pardon issued by President Biden on October 6, 2022. For the following reasons, this motion will be denied.

**A. Factual Background**

A federal grand jury returned a four-count indictment against Defendant in August 2022, charging her with a series of drug offenses and a firearm related offense. The count relevant to this motion is count three, the firearm offense, which charges Defendant with being an unlawful controlled substance user in possession of a firearm in violation of 18 U.S.C. § 922(g)(3) on or about February 10, 2022 (DE 1 at 3). The alleged facts underlying this charge are that Defendant possessed multiple firearms while also being a user of marijuana, which is a Schedule I controlled substance. (DE 1 at 3; DE 17 at 2.)

For the limited purpose of adjudicating this motion, the Court assumes these alleged facts to be true. The Court will reiterate that Defendant remains presumed innocent of the charges

against her, and the Court takes no position on the question of her guilt, or the veracity of any factual allegation presented by the Government.[1]

### B. Legal Standards

A defendant can move before trial to dismiss an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B). A defendant can make such a motion on the basis that the charged offense is based on an unconstitutional statute. *United States v. Holden*, 2022 WL 17103509, *2 (N.D. Ind. Oct. 31, 2022) (internal citations omitted).

A constitutional challenge to a statue can be brought either as a facial challenge, or an as-applied challenge. Defendant brings both types of challenges against § 922(g)(3) in her motion. To succeed on a facial challenge to the constitutionality of a statute, the moving party must show that the statute is unconstitutional in all applications. *City of L.A. v. Patel*, 576 U.S. 409, 415, 418 (2015). To succeed on an as-applied challenge, the moving party must show it is unconstitutional because the way it was applied to the particular facts of their case. *See United States v. Phillips*, 645 F.3d 589, 863 (7th Cir. 2011).

### C. Discussion

Defendant's motion challenges the constitutionality of 18 U.S.C. § 922(g)(3). This statute provides that "[i]t shall be unlawful for any person ... who is an unlawful user of or addicted to any controlled substance ... [to] possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(3). Defendant argues that "as applied to [her], § 922(g)(3) is not a well-defined firearm restriction" because the government is attempting to criminalize her firearm possession based on her status as an unlawful user of marijuana, when marijuana use during the

---

[1] The Government's response proffered additional, more specific, facts about the underlying conduct for the charge. In her reply, Defendant strenuously objected to the Court considering these facts. This objection is moot as none of the additional proffered facts are necessary to adjudicate this motion.

relevant period was no longer unlawful by effect of a presidential pardon. (DE 17 at 12–13.) Defendant's facial challenge is that § 922(g)(3) violates the Second Amendment. The Court will address each argument in turn.

### (1) *The Bruen standard for applying the Second Amendment*

Defendant argues that this case must be dismissed because 18 U.S.C. § 922(g)(3) is unconstitutional under the Second Amendment to the United States Constitution. Therefore, the Court must analyze and apply the Second Amendment jurisprudence articulated by the Supreme Court.

The text of the Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court concluded that the Second Amendment confers "an individual right to keep and bear arms." 554 U.S. 570, 595 (2008). In reaching this conclusion, the Court recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. Relevant to this case, the Court also warned that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* In a footnote, the Court went on to classify these traditional restrictions on firearm possession as a non-exhaustive list of "presumptively lawful regulatory measures." *Id.* at 627 n. 26.

In *Bruen*, the Supreme Court built upon its prior holdings to further define the scope of the Second Amendment right. The Court described its earlier Second Amendment decisions as "recogniz[ing] … the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." 142 S.Ct. at 2122. (citing *Heller*, 554 U.S. 570; *McDonald v. City of Chicago*,

561 U.S. 742 (2010)). The *Bruen* Court went on to lay out the methodology lower courts should utilize in reviewing Second Amendment challenges.

Prior to *Bruen*, the various circuit courts had largely converged on a two-step framework for analyzing Second Amendment challenges. *Id.* at 2126. At the first step, the government could justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the Second Amendment right as originally understood. *Id.* At the second step, the courts analyzed how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right. *Id.*

In *Bruen* the Court stated that this test was "one step too many." *Id.* at 2127. The Court held that the first step of this framework was broadly consistent with *Heller*, but the "means-end scrutiny" of step two was inconsistent with the Second Amendment and the appropriate methodology centers on the "constitutional text and history." *Id.* at 2127–29. The Court articulated that the proper standard is as follows:

> "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"
> *Id.* at 2129–2130 (quoting *Koningsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Phrased another way, this test is composed of two prongs. The first prong is determining whether the plaint text of the Second Amendment covers the conduct at issue. *Id.* at 2129, 2134–

35. The second prong is determining whether the Government has established the regulation is consistent with the historical tradition of firearms regulation in the United States. *Id*. at 2129–30.

The Supreme Court stated that the second prong would require the use of "historical analogies" and reasoning by analogy as is commonly done by lawyers and judges. *Id.* at 2132. Consequently, in comparing a historical firearm regulation and a modern one, the key determination to be made is whether the two are "relevantly similar." *Id.*[2] The *Bruen* Court did not provide an exhaustive survey of the features that could render regulations relevantly similar but found that *Heller* and *McDonald* outlined at least two: "how and why the regulations burden a law-abiding citizen's right to armed self-defense" *Id.* at 2132–33.[3] Phrased differently, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry." *Id.* at 2133 (quoting *McDonald*, 561 at 767 (itself quoting *Heller*, 554 U.S. at 599)).

The Court further noted that this analogical reasoning is "neither a regulatory straitjacket nor a regulatory blank check." *Id.* While warning courts to not "uphold every modern law that remotely resembles a historical analogue," the Court also clarified that the Government is only

---

[2] *Bruen* also stated that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131 (emphasis added). Some courts have read this language as creating a more stringent standard of review for gun regulations aimed at societal ills dating to the Founding era, and Defendant implicitly urges this Court to do the same. *See e.g. United States v. Holden*, 2022 WL 17103509, *3 (N.D. Ind. Oct. 31, 2022); *United States v. Lewis*, 2023 WL 187582, *4–*5 (W.D. Okla. Jan. 13, 2023). But the Court does not need to decide this issue. To the extent there is a distinction between "distinctly similar" and "relevantly similar" it does not help Defendant's case. The strong historical analogues discussed later in this order would satisfy either of these standards.

[3] While grouped with the "relevantly similar" discussion, these are the only comparative features the Supreme Court mentioned in its decision and therefore this Court finds they would be the key inquiry in applying either the "distinctly similar" or "relevantly similar" standard (if these are indeed separate standards).

5

obligated to identify a "historical *analogue*, not a historical *twin*." *Id.* (internal citation omitted). Therefore, even if a modern regulation is not a "dead ringer" for a historical precursor, it may be sufficiently analogous to pass constitutional muster. *Id.*

### (2) *Defendant's as-applied challenge fails as the presidential pardon is irrelevant to the charged offense in count three of the indictment*

The Court will begin with Defendant's as-applied challenge. The Court finds that this argument is without merit.

Underlying this argument is the fact that on October 6, 2022, President Biden pardoned all individuals who committed the offense of simple possession of marijuana in violation of 21 U.S.C. § 844 or D.C. Code § 48-904.01(d)(1) on or before the date the pardon was issued. Granting Pardon for the Offense of Simple Possession of Marijuana, 87 Fed. Reg. 61441 (Oct. 12, 2022) (Pardon issued on October 6, 2022, and published in Federal Register on October 12).

Defendant argues that the presidential pardon extends to her alleged conduct of marijuana use and therefore dismissal is compelled because of the pardon's retroactive effect. In other words, Defendant argues that on February 10, 2022, she was no longer "an unlawful user" of a controlled substance. Therefore she cannot be legally culpable for the offense of being an unlawful user of a controlled substance in possession of a firearm. In support Defendant cites dicta from a Supreme Court decision issued over 100 years ago stating that a "pardon not merely releases the offender from the punishment described for the offence, but that it obliterates in legal contemplation the offense itself." (DE 17 at 12 (quoting *Carlisle v. United States*, 83 U.S. 147, 151 (1872)). Defendant also argues that this pardon implicated the *Bruen* analysis as the Government would not be able to offer a historically analogous regulation based on substance use which the sitting President has proclaimed is no longer punishable conduct.

6

These arguments are without merit for several reasons. First, the text of the pardon itself precludes Defendant's arguments. President Biden's pardon expressly limits its effect to pardoning violations of 21 U.S.C. § 844 or D.C. Code § 48-904.01(d)(1). Pardon for the Offense of Simple Possession of Marijuana, 87 Fed. Reg. at 61441. President Biden goes on to indicate that he does not intend for the pardon to be applicable to any other offense.

> "*My intent by this proclamation is to pardon only the offense of simple possession of marijuana* in violation of Federal law or in violation of D.C. Code 48–904.01(d)(1), *and not any other offenses related to marijuana or other controlled substance*s. *No language herein shall be construed to pardon any person for any other offense*, … ."
> Id. (emphasis added).

This express limitation on the legal effect of the pardon forecloses Defendant's as-applied challenge. Defendant has conceded as much by not responding to the Government's argument of this point in her reply. *See Cincinnati Ins. Co. v. Eastern Atlantic Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (acquiescence to opponent's nonfrivolous arguments operates as a waiver).

Second, Defendant's argument is contrary to the established body of law holding that pardons preclude further punishment for the pardoned offense but *do not* erase the underlying conduct of that offense. *Hirschberg v. Commodity Futures Trading Comm'n*, 414 F.3d 679, 682–83 (7th Cir. 2005) ("The question we must answer, then, is whether the CFTC's denial of Hirschberg's registration is impermissible punitive action *or simply a consequence of the conduct underlying the conviction that the pardon could not erase.*") (emphasis added); *United States v. Flynn*, 507 F.Supp.3d 116, 136 (D.D.C. 2020) (holding a pardon cannot "erase a judgment of conviction, or its underlying legal and factual findings.") (internal citations omitted); *United States v. McMichael*, 358 F.Supp.2d 644, 647 (E.D. Mi. 2005) ("A [presidential] pardon does not

entail the expungement of judicial records or otherwise negate the facts of the underlying conviction.") (citing *United States v. Doe*, 556 F.2d 391 (6th Cir. 1977)).

Defendant's citation to *Carlisle* does not meaningfully challenge this understanding. Besides being non-binding dicta, the statement in *Carlisle* that a pardon "obliterates in legal contemplation the offense itself" does *not* state that the facts underlying the offense are likewise obliterated. 83 U.S. at 151. Moreover, *Carlisle* is bookended by Supreme Court decisions which are in line with the understanding that a pardon only precludes further punishment for the pardoned offense and does not erase the underlying facts. *See Carlesi v. New York*, 233 U.S. 51 (1914) (Upholding a New York state court's use of a prior, pardoned, federal offense as a sentencing enchantment); *United States v. Wilson*, 32 U.S. 150, 160 (1833) (holding a pardon exempts the individuals from *punishment* for the offense committed).

Third, Defendant's characterization, in her motion, of count three being predicated on the conduct of "marijuana possession" is simply not a correct description of the law. § 922(g)(3) criminalizes being a *user* of or *addicted to* a controlled substance in possession of a firearm, not being a possessor of a controlled substance and possessing a firearm. This is reflected in count three of the indictment which charges Defendant with being a *user*. (DE 1 at 3.) As previously discussed, the pardon's narrow limitation to two specific possession offenses makes it unavailing to Defendant here.

Defendant's second argument, that the existence of this pardon raises the Government's burden to offer a historical analogy of regulating firearms based on substance use which the President has proclaimed is no longer punishable, is incorrect for all the previously stated reasons. Further, as the Government rightly notes in their response, the pardon did not legalize marijuana and it remains a controlled substance. (DE 22 at 7.) Therefore it is inaccurate to claim

8

that the President proclaimed marijuana use was no longer punishable conduct given the President only forgave two specific offenses related to marijuana possession. Moreover, the pardon did not attempt to effect any change upon the firearms laws of the United States and has no bearing on how the *Bruen* analysis is applied.

Therefore, the Court denies Defendant's as-applied challenge.

### (3) *Defendant's facial challenge to § 922(g)(3) also fails*

The Court will now apply the two-pronged analysis for Second Amendment challenges laid out in *Bruen* to assess Defendant's facial challenge.

(a) *The Court assumes, without deciding, Defendant's conduct is protected by the Second Amendment*

The first step of a Second Amendment challenge is deciding whether the regulated conduct falls within the scope of the Second Amendment's plain text. *Bruen*, 142 S.Ct. at 2129–30. Therefore, the Court must determine whether Defendant, presumed for this motion to be an unlawful drug user as prohibited under § 922(g)(3), is among those protected by the Second Amendment.[4]

The Government argues that Defendant's conduct is unprotected as "the people" for the purposes of the Second Amendment only includes those who are law-abiding citizens. Some legal scholars have dubbed this the "civic virtue" theory of the Second Amendment. *See e.g.* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2008); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 492

---

[4] The parties do not dispute that the mere conduct of possessing a firearm would be protected by the Second Amendment.

9

(2004). The Court's research indicates that while several of our sister courts have endorsed this view, it is currently subject to a lively debate among federal jurists. *See United States v. Black*, 2023 WL 122920, *3 (W.D. La. Jan. 6, 2023) (collecting cases and helpfully summarizing holdings).

The Seventh Circuit has briefly engaged with this theory prior to *Bruen*, but it seems to be divided on the merits. In *United States v. Yancey*, the Seventh Circuit stated, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" 621 F.3d 681, 684–85 (7th Cir. 2010) (internal citation omitted). The court went on to use that logic, in part, to uphold the categorical disarmament of habitual drug users by § 922(g)(3). *Id.* at 685. However, five years later in *United States v. Meza-Rodriguez* the Seventh Circuit concluded that an unlawfully present noncitizen could invoke the Second Amendment. 798 F.3d 664, 672 (7th Cir. 2015) (reviewing a Second Amendment challenge to 18 U.S.C. § 922(g)(5)). The *Meza* court expressly declined to read *Heller*'s language of "law-abiding citizens" and "members of the political community" as defining the scope of "the people" for Second Amendment purposes. *Id.* at 669–70. The Court instead concluded "the people" had the same meaning as in other parts of the Bill of Rights. *Id.* This conclusion would suggest the Seventh Circuit had rejected civic virtue theory as discussed in *Yancey*. However, despite citing to *Yancey*, for a different proposition of law, the *Meza* court never addressed the tension between these two decisions. *Id.* at 672.

Four years after *Meza*, in *Kanter v. Barr*, the Seventh Circuit indicated that *Meza* had not settled this question. 919 F.3d 437 (7th Cir. 2019) (reviewing a Second Amendment challenge to 18 U.S.C. § 922(g)(1)). In *Kanter*, the majority cited to both *Meza* and *Yancey* without

10

reconciling the tension between the two in defining "the people" for purposes of the Second Amendment. *Id.* at 445–46. The *Kanter* court contemplated applying the civic virtue theory, stating "If, as we suggested in *Yancey* and as most scholars have concluded, the founders conceived of the right to bear arms as belonging only to virtuous citizens, even nonviolent felons like Kanter would fall outside the scope of the Second Amendment." *Id.* at 446. However, the court ultimately demurred on reaching such a conclusion and resolved the case at the second step of the pre-*Bruen* Second Amendment framework.

It is tempting to embrace the conclusion in *Meza* as the most direct guidance on this question. However, the Court will decline to do so for three reasons. First, as previously discussed, *Kanter* suggests that *Meza* did not actually decide this issue and there is no binding precedent to be applied. *Id.* Second, individual panels of the Seventh Circuit cannot implicitly override prior panel decisions. *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002) ("One panel of this court cannot overrule another implicitly."). Therefore, to the extent *Yancey* made a holding on the scope of "the people" for Second Amendment purposes that decision could not be overridden implicitly by *Meza*. Or to the extent *Kanter* sought to overturn a holding in *Meza*, the same impediment applies. Third, the *Meza* court acknowledged its decision was in conflict with at least three other circuits at the time. 798 F.3d at 669 (citing Fourth, Fifth, and Eighth Circuit decisions). It is possible that in light of *Bruen*, the Seventh Circuit would reach a different conclusion based on additional guidance provided in that case and subsequent developments in other circuits.[5]

---

[5] For example, *Bruen* used the phrase "law-abiding citizen" no fewer than fourteen times in describing the scope of the Second Amendment right. *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133–34, 2135 n.8, 2138 & n.9, 2150, 2156. This includes in key contexts such as holding that two key metrics for determining whether a regulation is relevantly similar, as compelled by *Heller* and *McDonald*, is "how and why the regulations burden a *law-abiding citizen's* right to armed self-defense." *Id.* at 2132–33. (emphasis added). Further, at least one circuit court panel has fully endorsed the civic virtue theory of the Second Amendment. *See Range v. Att'y Gen. U.S.*, 53 F.4th 262 (3d Cir. 2022) (vacated for rehearing en banc by 56 F.4th 992 (3d Cir. 2023)).

11

As this case can be resolved on the second prong of *Bruen*, the Court will leave this question for the Seventh Circuit to resolve. The Court will assume, without deciding, that Defendant is part of "the people" and the possession of a firearm is protected by the Second Amendment. The Court will now advance to the second prong of the *Bruen* analysis.

    (b) *The void for vagueness challenge Defendant raised in her reply brief is without merit*

Prior to engaging with the properly presented arguments on the second prong of the *Bruen* test, the Court will address the new argument Defendant raised for the first time in her reply brief. Defendant raises the argument that the term "user" in § 922(g)(3) is not defined by statute and therefore is too vague to be considered "a well-defined or reasonable restriction on firearm possession as *Bruen* demands" (DE 27 at 6–7.) The Court will deny this argument for two reasons. First, this argument makes no appearance in the motion to dismiss and is therefore waived. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[A]rguments raised for the first time in [a] reply brief are waived because they leave no chance to respond." (internal citations omitted)).

Second, and in the alternative, the Court would reject this argument on the merits. Contrary to Defendant's assertion, the term "user" is defined. Specifically, there is a federal regulation implementing the statute which defines the term. 27 C.F.R. § 478.11; *United States v. Seiwert*, 2022 WL 4534605, *2 n.2 (N.D. Ill. Sept. 28, 2022) (noting that 27 C.F.R. § 478.11 provides a definition for user in § 922(g)(3)). Further, in *United States v. Cook*, the Seventh Circuit rejected a challenge to § 922(g)(3) predicated on the term "user" being unconstitutionally vague. 970 F.3d 866 (7th Cir. 2020). Reaffirming prior Circuit precedent on the question, the court held that the term "user" means "one who regularly or habitually ingests a controlled

substance in a manner other than prescribed by a physician." *Id.* at 874 (citing *Yancey*, 621 F.3d at 682). Moreover, *Cook* expressly held that the statute is not "so indefinite as to inhibit the legitimate exercise of Second Amendment rights." *Id.*

The fact that *Cook* was decided prior to *Bruen* is of no consequence for two reasons. First, Defendant's only argument is the absence of a definition for "user" makes § 922(g)(3) inconsistent with *Bruen*. She has presented no argument as to why *Cook* is incorrect in light of *Bruen*. Second, the Court discerns nothing about the *Bruen* decision which would render *Cook*'s reasoning infirm. In *Bruen* the Supreme Court clarified how lower courts should apply the Second Amendment, but it did not utter a word about how courts determine whether statutes are unconstitutionally vague. Absent further direction from the Supreme Court, this Court would find that their comment about Second Amendment restrictions needing to be "reasonable" and "well-defined" incorporates pre-existing precedent for interpreting statutes and did not seek to overturn the entire statutory construction apple cart. *Bruen*, 142 S.Ct. at 2156. This limited interpretation of *Bruen* is most in line with the Supreme Court's notation that its decision was consistent with, i.e. building upon without disrupting, its holdings in *Heller* and *McDonald*. *Id.* at 2122. Therefore this Court has no reason to doubt that *Cook*'s holding that, at the time of *Heller*, § 922(g)(3) was sufficiently well defined to pass constitutional muster remains good and binding precedent.

(c) *§ 922(g)(3) is consistent with the historical tradition of firearms regulation in the United States*

The Court now turns to the dispositive issue of this case, has the Government carried its burden on the second prong of *Bruen* to show that § 922(g)(3) is consistent with historical firearms regulation in the United States? The Court finds the answer is yes.

The Government concedes that the specific regulation contained in § 922(g)(3), prohibition on the possession of firearms by unlawful drug users, did not exist at the time the Second Amendment was enacted. The Government also concedes that this federal statute was enacted in 1968 and is therefore not a longstanding restriction itself. However, the Government argues two relevant historical regulations are sufficiently analogous to support § 922(g)(3)'s constitutionality. The first is a history of state legislatures restricting the right of habitual drug users or alcoholics to possess or carry firearms. The second is a history of restrictions aimed at preventing persons considered to be dangerous or untrustworthy from possessing and using firearms. The Court agrees that both are sufficiently analogous to uphold § 922(g)(3).

Regarding the first argument, the Government points to the Seventh Circuit's decision in *United States v. Yancey*, a pre-*Bruen* decision upholding § 922(g)(3). 621 F.3d 681 (7th Cir. 2010). *Yancey* recognized that while Congress had not barred habitual drug users from owning guns until 1968, this development did not occur in a vacuum. *Id.* at 684. Instead, contrary to Defendant's assertion that § 922(g)(3) only reflects late 20th Century concerns, numerous state legislatures had "entrenched" regulations "restric[ing] the right of habitual drug users or alcoholics to possess or carry firearms." *Id.* at 684 (collecting state statutes and cases). These regulations demonstrated that Congress was not alone in considering habitual drug users unfit to possess firearms and that the prohibition was "the latest incarnation of the states' unbroken history of regulating the possession and use of firearms dating back to the time of the amendment's ratification." *Id.*

The Government argues that *Yancey*'s historical analysis, showing similar regulations have long existed without question to their constitutionality, directs the Court to uphold §922(g)(3) in this case. The Court agrees. Defendant's only argument against *Yancey* is that it

utilized the pre-*Bruen* test for Second Amendment claims. This is true, however, *Yancey*'s historical analysis, of state law disarming alcoholics and habitual drug users, at the first step of the old test was recognized as "broadly consistent with *Heller*" and remains valid. *Bruen*, 142 S.Ct. at 2127–29. Furthermore, the historical analysis in *Yancey* has been positively cited by our sister courts in rejecting *Bruen* challenges to § 922(g)(3) which indicates its continued validity. *See e.g. United States v. Daniels*, 2022 WL 2654232, *3 (S.D. Miss. July 8, 2022) (upholding § 922(g)(3) in part based on the historical analysis in *Yancey* and other circuit court decisions); *United States v. Seiwert*, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) (upholding § 922(g)(3) and citing to *Daniels*); *Black*, 2023 WL 122920 at *4 (upholding § 922(g)(3) and citing to *Yancey*'s analysis).

Moreover, a sister court examining a *Bruen* challenge to § 922(g)(3) recognized additional historical support for the statute in the form of early American intoxication laws. In *Fried v. Garland*, the court recognized a history of statutes from the founding and reconstruction eras which restricted gun possession by the intoxicated. 2022 WL 16731233, *7 (N.D. Fla. Nov. 4, 2022) (describing a 1655 Virginia statute, a 1771 New York statute, and several from the era following the ratification of the Fourteenth Amendment). Some of these statutes prevented individuals from carrying firearms while intoxicated, and others prohibited individuals from firing a gun while intoxicated. *Id.* The Court finds these additional historical examples, of statutes regulating firearm possession and use by individuals using intoxicating substances, supplement and affirm the historical findings in *Yancey*.

Defendant's argument that the regulation in § 922(g)(3) is of a "wholly recent vintage" is unpersuasive in light of the historical record indicating entrenched state provisions for regulating this type of behavior. (DE 17 at 11). The same holds true for her argument that the scope of this

regulation, i.e. banning possession of a firearm at all by users or addicts, is without a historical analogue. Further, *Fried* nicely describes how the prohibition in § 922(g)(3) can be analogized to the historical intoxication statutes. Under those historical regulations the intoxicated could not carry or use firearms, while under the modern regulation an *active drug user* cannot possess firearms. 2022 WL 16731233 at *7. So, for the duration of the period individuals are using intoxicating substances, their Second Amendment rights are impaired. *Id.*; *see also Yancey*, 621 F.3d at 687 ("the gun ban [in § 922(g)(3)] extends only so long as Yancey abuses drugs"). Both groups are then able to regain their Second Amendment rights by simply ending their substance use. *Fried*, 2022 WL 16731233 at *7. These historical regulations may not be "dead ringer[s]" for § 922(g)(3), but they are not required to be and are nonetheless sufficiently analogous. *Bruen*, 142 S.Ct. at 2133. As such, the scope of § 922(g)(3) is in line with these historical examples.

Defendant also argues that the modern restriction is overbroad because the definition of "user" in the implementing regulation does not require "[the drug use to be] on a particular day, or within a matter of days or weeks before, … ." (DE 27 at 7 (quoting 27 C.F.R. § 478.11)). In other words, Defendant argues that there is no historical analogue regulating firearm possession based on use of a controlled substance that occurred days or weeks before the firearm possession. First, this argument is non-responsive to the historical analysis in *Yancey* supporting such restrictions. Second, the bottom-line requirement of the regulation is "*that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct. … .*" 27 C.F.R. § 478.11 (emphasis added). This requirement that the individual is actively engaged in substance use is analogous to the historical regulations in *Yancey* and *Fried* which prevented possession of firearms by individuals during the course of their intoxicant use. This relatively flexible evidentiary requirement for determining whether a person is *actively engaged* comports

16

with the definition in *Cook* that a user is "one who regularly or habitually ingests a controlled substance." 970 F.3d at 874. Determining habitual or regular use inherently requires examining a broader time span to determine a pattern of behavior, and this does not implicate a Second Amendment issue. Additionally, as previously mentioned, *Cook* expressly held that this definition was compatible with the Second Amendment. *Id.* To the extent Defendant wants to argue her use was too far away in time to constitute "active use" that is an argument of fact to be made to the jury.

The historical record shows a tradition of regulating firearm possession by individuals using intoxicating substances which is analogous to § 922(g)(3). Therefore, the Court finds that Government has met its burden and concludes that § 922(g)(3) is constitutional.

In the alternative, the Court would also uphold § 922(g)(3) as it is analogous to historical regulations preventing dangerous persons, such as felons and the mentally ill, from possessing firearms.

While a judge on the Seventh Circuit, Justice Amy Coney Barrett made the keen observation that "[h]istory is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter*, 919 F.3d at 451 (Barrett, J. dissenting). It is well established that there is a history and tradition in the United States of disarming persons who would pose a threat to public safety if allowed to possess firearms.[6] *See e.g. United States v. Barber*, 2023 WL 1073667 (W.D. Tex. Jan. 27, 2023)

---

[6] The Government candidly acknowledges that *some* of these historical measures were motivated by racial animus. (DE 22 at 13.) *See e.g. Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012)(identifying classes of individuals perceived to be dangerous and disarmed during the colonial era). Defendant in turn requests the Court excise any such history from its consideration. This request is moot. Given the plethora of non-racially animated disarmament provisions, the Court need not consider any racially animated measures to conclude the above-described historical tradition of disarming individuals deemed to be dangerous exists. In addition to the examples in the body of this opinion, there are measures such as disarming Loyalists to the British Crown. *Id.*

(summarizing historical record); *see also United States v. Rahimi*, 2023 WL 1459240, *8 (5th Cir. Feb. 2, 2023) (noting historical examples of laws disarming classes or groups of people determined to be dangerous in order to preserve political and social order).[7] This tradition includes the long-standing, and presumptively valid, regulations of disarming felons and the mentally ill. *Heller*, 554 U.S. at 626, 627 n. 26; *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J. concurring). Since *Bruen*, several sister courts have upheld § 922(g)(3) by finding it is analogous to the these regulations. [8] *See e.g. Fried*, 2022 WL 16731233 at *7–*8; *Black*, 2023 WL 122920 at *3–*4; *Daniels*, 2022 WL 2654232 at *3–*4; *Seiwert*, 2022 WL 4534605 at *2; *United States v. Sanchez*, 2022 WL 17815116, *3 (W.D. Tex. Dec. 19, 2022); *United States v. Lewis*, 2023 WL 187582, *4–*5 (W.D. Okla. Jan. 13, 2023); *but see United States v. Harrison*, No. CR-22-328-PRW (W.D. Ok. Feb 3, 2023) (striking down § 922(g)(3) and finding it is not analogous to these historical regulations).[9] The Court agrees with these courts and finds that § 922(g)(3) is sufficiently similar to these long-standing regulations to pass constitutional muster.

---

[7] Defendant filed *Rahimi* as supplemental authority in this case, arguing it supports her position. The Court disagrees. *Rahimi* struck down § 922(g)(8), which is quite dissimilar from § 922(g)(3). § 922(g)(8) prohibits firearm possession by individuals subject to domestic violence restraining orders based on their threat to a specific individual, and not a defined class of persons based on their danger to society writ large (such as the felon restriction). As noted above, *Rahimi* actually endorses the latter type of restrictions as consistent with the historical record. As § 922(g)(3) resembles the latter type of restrictions, the findings in *Rahimi* support the constitutionality of the statute at issue in this case.

[8] While not dispositive to the Court's analysis, it would note that at least nine district courts have adjudicated *Bruen* based challenges to § 922(g)(3) and all but one have upheld the statute.

[9] The Court is not persuaded by *Harrison* in part due to the weight of authority reaching the contrary conclusion, the Court's own analysis of the arguments presented in this case, and disagreements with the analysis and conclusions reached by the court in *Harrison*. For example, the Court would note that *Harrison*'s reasoning distinguishing the tradition of disarming dangerous persons from § 922(g)(3) seems reliant on reinterpreting those traditions based on pre-*Bruen* dissents from circuit decisions. *See e.g. Harrison*, No. 2:22-cr-83 at *31–*32. The Court is not persuaded such a dramatic departure from existing precedent is required given *Bruen* established it was consistent with *Heller*, and the first step of the pre-*Bruen* test was also consistent with *Heller*. *Bruen*, 142 S.Ct. at 2127–30.

As previously stated, the key inquiry is "whether modern and historical regulations impose a comparable burden on the right of [law-abiding citizens to] armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S.Ct. at 2133. In terms of burden, § 922(g)(3) prevents a certain, clearly defined, group of people from possessing a firearm. This is the same mechanism by which the bar on felons and the mentally ill from possessing firearms operates. In fact, § 922(g)(3) is actually less onerous than the provisions regulating felons and the mentally ill. The burden imposed by § 922(g)(3) only endures for as long as the individual is an unlawful user or addict, leaving them free to regain their full Second Amendment rights at any time. *Yancey*, 621 F.3d at 687; *Fried*, 2022 WL 16731233 at *7. In contrast, the burden imposed upon convicted felons and the mentally ill is a lifelong one. *Yancey*, 621 F.3d at 687. Therefore, the Court finds that this, relatively lenient, burden placed on a defined group of persons is directly analogous to the burden placed on felons and the mentally ill.

In terms of justification, it is undisputed that Congress enacted the exclusions in § 922 to "keep guns out of the hands of presumptively risky people." *Yancey*, 621 F.3d at 683. Common sense and an empirical record support Congress' conclusion that individuals who unlawfully use, or are addicted to, controlled substances may be dangerous if they possess firearms. *Yancey*, 621 F.3d at 685–86. Defendant does not dispute this conclusion about dangerousness. Therefore, the negative implications for the maintenance of good social and political order posed by dangerous persons carrying firearms needs no further elaboration. As such, the Court finds that the exact same justification underlies § 922(g)(3) and the well-established regulation of firearm possession by felons and the mentally ill. Accordingly, the Court would alternatively find that § 922(g)(3) is analogous to the historical firearms regulations which disarmed dangerous persons and the Government had carried its burden here as well.

The Court concludes that the government has established that the restrictions imposed by § 922(g)(3) are consistent with the history and tradition of firearms regulation in the United States and that the Government has carried its burden on the second prong of the *Bruen* test. Therefore, the Court denies Defendant's facial challenge to the statute.

### D. Conclusion

Accordingly, for the reasons previously stated, Defendant's motion to dismiss count three of her indictment is DENIED (DE 17).

SO ORDERED.

ENTERED: February 9, 2023

                                              /s/ JON E. DEGUILIO
                                              Chief Judge
                                              United States District Court